009 Weithoner v. United States Postal Service Mr. Stanton, did I pronounce your client's name properly? It's really Weithoner. Weithoner, okay. All right, and you've reserved five minutes of rebuttal? Yes, Your Honor. And you know how our lights work? Yes, Your Honor. Okay, you can start whenever you're ready. May it please the Court, Your Honor, this is not a complicated case. We're quite happy to say we think that it's rather specific and narrowed down and not quite so complicated as the cases you've just been hearing. When I was in law school, one of my older professors liked to quote Shakespeare and he liked to say, words, words, words. And he's pointing to that basically to say this applies to statutes and contracts. Look at the words. If I remembered anything else, I remember that part. The problem is that here, just as in the last case, the contract is not that well drafted. And the problem is that instead of referring in paragraph 6 to Mr. Weithoner's misconduct, alleged misconduct, it refers to his removal. Her. Her removal, excuse me. Right. That's the problem. I mean, if it had said, is agreed that all references to Mrs. Weithoner's alleged misconduct shall be expunged, we'd probably have a pretty easy case. But that's not what the language says. Well, yes, Your Honor, but the basic thing is that if you're looking at, go back and look at what was in the removal documents and the decision, that's what they referred to was her alleged misconduct of kind of touchy-feelys on her particular one employee. Not sexual anything. But the idea was that all, I think you need to go one more word past that sentence, Your Honor. It says, it is agreed that all references to Mrs. Weithoner's removal shall be expunged from her official personnel records. If we just stop right there and say, well, okay, I guess what does that mean? The next word, however, says, nevertheless, such as like we have an exception here, the exception being, nevertheless, it is further agreed that should Mrs. Weithoner be charged with similar misconduct at any time within two years from the date this agreement is signed by the parties, this agreement may be cited as an aggravating factor to show that Mrs. Weithoner was not noticed. But you've got a problem right there, too, because this sentence isn't well drafted either. It doesn't say her alleged misconduct may be cited. It says the agreement may be cited. And there doesn't seem to be any qualification on the obligation of the agency to remove references to the removal from her personnel record. I mean, the agency isn't given any qualification on that. It has to do that flat out. It says, you have to remove all references to the removal. But then it says, oh, however, kind of in terms of a by the way, if she's charged with similar misconduct, you can use this agreement to show that she was on notice. Now, the idea, Your Honor, was that she was charged. The decision was made. We appealed it. We could have gone to a hearing before the administrative judge. And had we gone to the administrative judge and she would have found any of that alleged misconduct, there would have been an official record of that on her official record. The fact that we entered into a settlement agreement removes any and all of that, you know, like if you have a personal injury thing, nobody's liable or anything else. It's gone. But isn't the problem here, Mr. Stinn, the problem seems to be that what happened here isn't covered by the agreement. What happened here was she went to Waterloo. She worked there as the postmaster, correct? Yes, Your Honor. And then she apparently resigned after a period of time to care for her ill mother, correct? Yes, Your Honor. Then she sought reemployment back at the same Omaha facility where she had been, right? Well, initially, yes, Your Honor. Yeah, initially. She said first she sought – she applied for a managerial position or a supervisory position. And then she said, all right, I'll apply for a clerical position. Now, she was never charged with any misconduct. No. And what happened was she came back to the agency and said, rehire me first at this level, and then she said, okay, at this level. So the agreement doesn't cover what happened here. That's true. It doesn't speak to this circumstance, does it? Yes, Your Honor. Well, to a certain degree. The idea is that the purpose of having the agreement was to put everything to rest, get her back to work. Not at the place where she was. She was still a manager, but at a much smaller place. Well, wait a minute. Hold on. I get confused very easily, and I'm confused again. The sentence says, it is agreed that all references to Ms. Withhoner's removal shall be expunged from her official personnel records. Let's stop right there. Was it understood that somebody would open up her official personnel record and throw away some papers, but that everybody would nevertheless be free to comment about this whole matter if the question ever came up? Your Honor, it's not in the official records to not be used against her. So that was the expectation? Yes. That by expunging her official personnel records, the effect of that would be an effect to silence the entire Postal Service with regard to any allegations that have anything to do with the events that led up to her removal. Was that your understanding? It didn't happen, Your Honor. It's like she had something else going on. She wanted a different upgrade or anything else. What is your understanding of when these two officials sent these identical letters? I think part of the problem is what Judge Dyke was pointing out, is that she did something I think nobody expected her to do, which was to reapply to the same place where she'd had all her trouble. Now, it's probably the case that given the nature of the charges against her that there was a lot of information within the post office there about all the events because it's too juicy for people not to have been talking about. Now, what do we know about where these two officials who sent her identical letters referring to her exhibited behavior that was inconsistent with the Postal Service standards of conduct, where would they have gotten that information? Very good, Your Honor, because I was going to get to that. Now, just looking at the agreement itself, four people signed the agreement, myself, my client, Mr. Glassburner for the agency, and Mr. Eves, who was the attorney. Interestingly enough, as I found actually in rereading the joint appendix, on page 57 of the joint appendix is a copy of an email that Mr. Glassburner sent to Mr. Eves. They were not co-located. Mr. Glassburner was in Omaha, Mr. Eves at that time was in St. Louis. Asking about this, that happens to be on Friday, August 1st, 2003, talking about does this look okay, meaning how they were going to respond to Ms. With Honor's request for a job, and Mr. Eves comes back and says it. So we're really talking about two people who were the representatives for the Postal Service who signed the agreement. Now, that kind of really amazed me and kind of aggravated me, the fact that what he should have said is that's not what should have happened. Right. Your argument is that given the language of paragraph 6, they had no business writing that letter, is that what you're saying? That should have been an easy answer. It should have been, no, that's outside what we can do, don't do it, give her some sort of a job. Or give her a different excuse. Yes, that's one of them. But there wasn't another excuse because she didn't have any, she performed well as her new job. So our saying is she was working well, she got back to work, she's working well, she had this unexpected matter come up regarding the health of her mother. Mr. Stanton, let me ask you, the two letters there, 23 and 24 of the joint appendix, at least we're talking about the letters with respect to the supervisory position. Assume that all that was in the letter was the last paragraph. Very seldom, if ever, do I grant reinstatement requests and I've decided to decline your request as well. I assume that if that was the extent of the letter, you wouldn't be here. I'd have a hard time saying, what are they trying to do? They're just doing what they, as we've said all along here, these people didn't like her. You'd have a much more difficult proof problem. I'd have nothing to really point to to say why are they saying that, other than to say you don't have any reason. Our point is that we try to be as specific as you can. You know when you start out on this, you're putting it together, you say okay, get her back to work, she's going to go over here. They said, you know, we'll give her a job. They wanted her out of there. Who drafted this? Mr. Eves. And he called me. Actually, as I indicated in the declaration in there, what we were doing, we wanted to get it that there would be a clearer thing that there would never be another mention of this incident. Well, but it doesn't say that. No, I don't. That wouldn't just give them the idea. They came back and said, no, no, no, no, we want to be able to say that if she gets in trouble like this again, we don't want her coming out and saying, hey, first time offender. You know, I've never done it. So that's why they, that's, I'm telling you exactly what happened. And it is in the declarations there. So, we compromise it, sure. If she gets in trouble, and they said, we want to. Well, it sounds like the agency got into the agreement, the language it felt was important. Oh, yes. But it doesn't sound like you got into the agreement, the language you felt was important. Well, I did because I thought that, okay, as long as she doesn't get in any trouble, and that's her problem. If she gets in trouble, then she's going to have a removal action. But there's nothing in the language of the agreement that says if she reapplies for employment at the Omaha distribution center, they cannot take into account her prior conduct there. Your Honor, that's why we have some flat foreheads. I didn't think of that. But isn't there some, I mean, one of the things the agency bargained for here was to have her leave this facility. Okay. That's right. Certainly, say, for example, she had left the facility on March the 1st, and she goes to Waterloo, and one month later, on February the 1st, she comes back and resigns from Waterloo and reapplies at the distribution center in Omaha. That would sort of… But in my estimation, because of this other matter that came up with her mom, it wasn't something… No, I'm not saying that. She never asked me about it. That didn't happen here, but the point is there is a little bit of a difference here, I think. It's not unreasonable to look at it a little bit differently when you're talking about the facility where she worked. That's true. But, Your Honor, the thing to remember on that is after I talked to Mr. Eves about saying, hey, we think there's a problem here, then I talked to my client, and she says, I'll go ahead and, if they're worried about my management, I'll go ahead and work as a clerk. So then I said, well, put in your thing, and I told him, I think this will all go away. How can you not take her as a clerk? Pardon me, Your Honor? She was applying on day 22. This letter is applying to go back to Omaha as a clerk, right? Well, but not necessarily the same area. Omaha has a lot of different…they could have put her in different substations and branches. That was…they just… Why didn't she apply to go back to Waterloo? Waterloo just kind of is a very small…and they failed the position, so it's not like, I don't know what that means. As far as I'm concerned, they could have said, okay, hey, this is what we bargained for. We'll move that other person out and put you in, but that was not an option, or they didn't even look at it. That's the way I look at it. I mean, the idea was, I'll go back to my time in the military when I used to handle a lot of these, and if somebody came up and said, put him back to work. What remedy…assuming hypothetically that we agree that with the dissent at the board that this is a breach of the agreement, what remedy do you think is appropriate? Well, you need to go back and find her a place, you know, if they could. What's to prevent her from applying somewhere else now? Lincoln, Nebraska, Des Moines, Iowa, Waterloo? Nothing, Your Honor. I think just the fact that where she is located, that her family, her mother, whatever, she's got her elder…or she did have her elder mother. I don't know whether she does. She's just not…the other thing is her husband actually works for the post office also. In Omaha? In Omaha. So his job is there. All right. Well, we'll…I take it. Mr. Stanton, we'll give you your full five minutes of rebuttal. We'll hear from the government. Thank you, Your Honor. Mr. Donahue? May it please the court. As this court has previously held, the settlement agreement must be enforced according to its terms. Paragraph 2 of the agreement required the Postal Service to rescind Ms. Withoner's notice of removal and the letter of decision. It did so. Paragraph 6 of the agreement required the Postal Service to expunge all references to Ms. Withoner's removal from her official personnel records. It did so. The agreement also required the Postal Service to downgrade her to a position of Postmaster of Waterloo with the same pay and with all the necessary training for her to take that position. Counsel, let me ask you this question. Assuming your interpretation, which is implicit in the way you presented it, let's assume that two months after Ms. Withoner becomes the Postmistress out at Waterloo, a call comes in to the Omaha Post Office from FedEx, and FedEx says they're considering hiring her as a supervisor, and the FedEx person talks to Carl Schroeder, Sr. who was her supervisor and knows all about what went on, and he actually issued the letter of decision that triggered this whole mess. He says, well, the record has been purged, but let me tell you what that woman did, and let me tell you what we did. And we put her out in the boondockies, and if you want her, you can have her because she's really a problem. Would you think that was a breach of the deal or not? I wouldn't, according to the terms of the agreement, Your Honor. You would say, whatever they bargained for, they got because we threw away the paper. You really think that's what they were bargaining? You think they were bargaining for having a shredder applied to her file? Is that what they cared about? They wanted the paper nicely shredded? If the court is to interpret these provisions to mean that she was entitled to a clean record, which there's certainly… She was entitled to silence. That's what she bargained for, right? Well, and when you look at the cases, and I think this agreement is no different, that talk about having a clean record, it talks in terms of having a clean record somewhere else, meaning whether it be with another employer or whether it be in another part of the country. And so in that case, if we interpret the agreement to mean that she is entitled to a clean record, it simply means that that's correct, Your Honor. If we interpret it that way and she went to another employer and the postal service had relied on this prior misbehavior in order to possibly prevent her from getting another position, then the petitioner would have a much stronger argument. How about if she applied to the postal office for a position at Waterloo or somewhere else? Same result, Your Honor. If we interpret it to mean clean record, then that would be a breach of the agreement. So your argument is the only place where she can't get a clean agreement is back at Omaha? That's correct. Why? Because the benefit of the agreement for the postal service here was to transfer her out of Omaha, a place where she had been accused of harassing another employee, and there are obvious reasons why the postal service wanted her out of that location. But that's not what the postal service said when it said, we're going to remove all references to her conduct. We're going to expunge all of this from her official personnel records. Why didn't they say, so long as you stay the hell away from Omaha? Well, they certainly didn't specifically say that, Your Honor. But I think from the agreement itself, you look at the terms of it where it says that they will transfer her to Waterloo. They will provide her with training in that position. And in fact, the other thing that they did was they gave her, within two years… I'm confused. I thought that the board was relying on the use of the word removal in this agreement. Suppose instead of removal it said facts surrounding the removal. Okay? Would the government lose this case under those circumstances? No, Your Honor, because I think it still complied with its agreement to remove documents that related to her removal or her behavior. The only thing that would be in her personnel records would be the settlement. So in other words, are you relying on the use of the word removal or not? I don't think we need to, Your Honor. Should we construe removal to mean facts surrounding the removal? No, I don't think you should, Your Honor. I think removal is clear. The petitioner could have bargained to bargain for the behavior surrounding, but he didn't. All right. So you're saying that it says removal. You're also saying that even if it said – if we interpret it – facts surrounding the removal, that it only refers to the official records and that the people can rely on an institutional memory to ding her for another job. So long as – and if we take the clean record interpretation, that goes to positions back where she was transferred from. If she had been applying to Oshkosh instead of Omaha, I don't think we'd have this problem here. And certainly petitioners are – I don't understand what you're saying. Because if we interpret these provisions to mean that she is entitled to a clean record, in other words, a clean slate, the Postal Service doesn't necessarily take issue with that, although it would first say that the terms of the agreement are clear. But to the extent we looked at the effect of those terms, as Judge Plager was pointing out, the benefit of the bargain for the Postal Service was that that clean slate has to be somewhere else. It can't be back in Omaha with the Postal Service. If she wanted to work for another employer, like Judge Plager's example – You're asking us to imply a term into the agreement that she can't go back to Omaha. No, Your Honor. What I'm saying is the agreement should be enforced as it's written. How's it written? I don't understand. What's the language I'm supposed to focus on? In order for a petitioner to win, Your Honor – What's the language? That the Postal Service is only required to rescind it and remove these documents. That's it. That's the terms of the agreement. The only way the petitioner wins is if we look at the effect of those terms. If we look beyond that to talk about what the terms meant in the circumstance that wasn't contemplated, specifically provided for in the agreement, which is she applies elsewhere. If she would have applied to another location or even another employer in Omaha, and we interpret the agreement to mean that she was entitled to a clean slate, and the Postal Service had – Should we? No, I don't think you should, Your Honor. And why is that? Because the first point being I don't think the agreement provides for that. And secondly, because – Well, no, but Mr. Donahue, the agreement says her record will be purged, correct? That's true, Your Honor. And implicit in that is the fact that, number one, material will be removed, and, number two, material that was in there will not be used against her. Now, you make the argument that there's a different situation with respect to the Omaha facility because, and as Judge Plager suggested, people are going to know what happened, and you can't erase mimes or memories. But you do say at page 11, with owner's argument, might have more force if she sought employment with another agency or even another part of the Postal Service. So, I mean, I think you're, you know, and to your credit, candidly acknowledging that, you know, that she is entitled to some protections with respect to this material, but it's simply we're in a little bit of a different ballpark when we're talking about the Omaha facility because they bargained to have her leave, and that was part of their bargain. That's correct. Plus, it's impossible for people, while you can remove things from the file, for people not to remember, at least over a certain period of time, what happened. That's correct, Your Honor. And I think that's consistent with this Court's prior jurisprudence when they have interpreted provisions such as these to mean clean record. It has always been in the context of an employee applying to another agency. And so you're saying is if she applied, if this case was an application, to take Judge Plager's example with FedEx or to a postal facility in Los Angeles, you in effect would say that there was error here. If the Court interpreted it as a clean record, yes, there would be. Well, it has to be interpreted that way. Okay. Well, then to the extent that it is interpreted that way, then yes. Mr. Donohue, your responses earlier and now to our presiding judge make a lot of sense to me. I think that interpretation makes sense, and I'm going to ask Mr. Stanton about it in a minute. But my problem is I don't see that in the documents. How do we get there? What is the hook on which we hang this whole new construction? Well, I don't know that it's a new construction. I think in order for the petitioner to succeed, he has to point to a provision in the agreement that's been breached. Well, he can point to that first sentence in 6. Right. And I think the evidence that we have in the record for this construction is in paragraph 3 and in other provisions of the agreement that say not only should she be transferred from Waterloo, but that she should be given training, that she should have job protection. That's further evidence in support of the Postal Service's interpretation that this move to Waterloo outside of Omaha, in other words, getting her away from Omaha, was not meant to be a temporary situation. It was meant to be a permanent move. You're talking about paragraph 2 where she says, By signing this agreement, Ms. Whithon, I request to be voluntarily downgraded to the position of postmaster, etc., at Waterloo. So, what you're saying is that when you read that, obviously, both parties got a bargain here. She got the removal taken off her record. She was not removed. The benefit of the bargain, and she got some fees, I guess, didn't she? Yes. She got fees. And the benefit that the Postal Service got was that she would leave Omaha. That's correct. And I apologize for the reference to paragraph 3, although there is further evidence in paragraph 3 in that it provides for necessary training for that new position at Waterloo. I suppose you would argue that the paragraph 6 is ambiguous, and therefore, we can construe it in the context of the entire agreement. Certainly, it could be construed as ambiguous around the Postal Service's initial positions. Obviously, it's not. But to the extent that the court interprets it as a clean record, then, yes, it would be ambiguous. And then you would have to look at the purpose of the agreement from both sides' perspective. What grade level was she reapplying for? Was she seeking reinstatement, too? She initially sought reinstatement. She didn't specify a grade level, but it was to a supervisory or managerial position in the Omaha location. But the clerk position would have been what grade? That would have depended on the collective bargaining agreement where she was slotted in. But she was just applying for a general clerk position in the collective bargaining agreement. If she were granted a position, would it dictate what exactly position she would have? What was the man coming? I don't know the answer to that. As far as the second sentence of paragraph 6 of the agreement, I think that second sentence clearly goes only to the situation where we're dealing with subsequent discipline. It doesn't cover the situation whereas here the petitioner seeks reinstatement, particularly to the position from which she's been removed from. What would be the best remedy if you were sitting up here and wanted to write an opinion in this case? What would you say the proper remedy is? Remedy meaning, well, obviously, I'd like a deferment, Your Honor. But I assume you mean if the Postal Service were to lose? Well, if we all understood what we've just been talking about, which is that, as written, 6 is not very clear, but we all understand it to mean a clear record, but stay away from Omaha. Let's assume that understanding comes out of looking at the entire document. Or stay away from the Postal Service. Or stay away from the Postal Service in Omaha. Thank you for that. She can go to Omaha. What would we say at this point? We can't affirm the board blanket affirmance, I don't think, can we? Certainly you can, Your Honor, because the construction of the agreement is de novo. So if the court believes it's an interpretation of the agreement, even if it's slightly different than what the board did, it can certainly affirm based on its interpretation. Well, I think the two letters that were written were clearly a breach of some kind. They may not have been a material breach because she was back trying to get into the Postal Service at Omaha, but they clearly were a breach by the man who wrote the original deal, which I appreciated Mr. Fenn pointing that out. And then he approved, saying, you know, you were a bad girl. I mean, you can't have that. Now, he may very well have said, sorry, no place for you in Omaha, and we'd all understand that. But what they did was not very good. So what do we say? Well, I think what you can do, Your Honor, is that I still do believe that you can affirm based on this court's understanding of the agreement. It would certainly be appropriate to place whether it be a comment of, you know, to the extent Ms. Withhonor seeks employment elsewhere within the Postal Service or to another employer. Let's be clear here that they are not to reference this at all. But I don't think it's necessary here. Isn't that part of the relief that she sought here? I mean, she wasn't just seeking to get a job at Omaha. She was seeking to enforce the terms of the agreement and to prevent them from disclosing this prior election's conduct, right? And to the extent she applies to somewhere other than Omaha and the Postal Service, she is entitled to enforcement of that, but she hasn't done that here. The government's position, Mr. Donahue, is that we agreed to take everything out of her records, and we agreed not to say, implicitly we agreed not to say negative things to people in other agencies? Or in our agency. Or in our agency outside of Omaha. That's agreed, right? Yeah, I can agree with that. Yes, sir. All right. Thank you. All right. Mr. Stanton, you have your full rebuttal. Mr. Stanton, how does all that leave you? Are you unhappy? Are you happy? Are you— Well, I'm unhappy. Here's my feeling about it. That's our position. She went to work. They dictated where she was going to go. She went there. She stayed there. She was performing well. She had an unexpected situation come up, a daycare, a humanitarian matter with her mother, so she quit. I wish she had said something to me. I would have tried to say, go get leave of some sort. What are you unhappy about, other than life? No, what I'm unhappy is that there is nothing to say that she should not work at the Postal Service. Oh, yes, there is. Well, not in the Postal Service, but if you read the entire settlement agreement, it's pretty clear that they did not want her to stay at the Omaha Postal Service operation. And that seemed reasonable under the circumstances, don't you think? You negotiated to get her moved to Waterloo. Here's what they wanted. They wanted her gone. That's why they had a removal. Suppose she'd asked the next day to transfer back to Omaha. I think that would appear to be bad faith, Your Honor. But they could have refused to do that, right? So why should reinstatement be treated any differently? Because she didn't have any ulterior motive of doing this. But that doesn't matter. What she bargained for was elimination of the removal action and removal from her records of negative information relating to these incidents. And also she got attorney fees. And she also got a position at Waterloo in a management position. I agree it's a smaller facility. And training. At the same time, the one thing that the agency got was she left Omaha, the Omaha facility. She had about 18 years of service, Your Honor. So what she wanted was she wanted employment with the Postal Service so she could continue with her career. What the Postal Service wanted, they got Ben out of shape. They wanted her gone. Does she want to reopen this thing? Would she want us to hold that there was a breach and now she's entitled to have her case reopened from the beginning? If it should so be that way. No, no, you don't want them to go back and do the removal action again. No, we don't want to. That's what I'm asking. I'm asking you, would you like us to rule that there's been a breach, the contract, the settlement is off, and you're back now to the removal issue? No. You don't want that. What I want you to say is there was a proper settlement. She was working. She had no ulterior motive for leaving. She should be able to continue to work as she had before. But not in Omaha. No, it doesn't say that about Omaha. If they want to say that, I'll be happy to say it outside of it. But the fact of the matter is she should be allowed to continue to work there because it's our position they got the opportunity to get rid of her and they're doing unofficially what they could not do officially. And they, I'll give you this, the real truth of the matter. It seems, Mr. Stanton, it seems that, you know, I understand what you're saying, but it really does seem that based upon the colloquy we've had with you and Mr. Stanton and based upon what Mr. Stanton, I'm sorry, Mr. Donahue, I apologize, based upon the colloquy we've had with you and with Mr. Donahue, it does seem that if at some point in the future, either tomorrow or six weeks or a year from tomorrow, Ms. Whithoner applies in Omaha to work at Home Depot, FedEx, or if she applies to work at the Postal Service in Fargo, North Dakota, or Hartford, Connecticut, she will, the government understands that there should be no negative information in any such application process. And that seems to be a good circumstance, and it seems to be one that is consistent with the agreement of the parties as referenced in the documents. No, I don't think so, Your Honor. I'll tell you, as I was telling earlier, my feeling is had she gotten in trouble and if they want to say, okay, this agreement stopped as of the date that she actually left, and there's still a year and a half left on this that she has to pay good, they could put her in the worst job they've got and say, if you get in trouble from that day forward, you've got 18 months left here that you don't get in trouble, or we can handle you, and then we can discuss it. Let me ask you my question one last time. As between Judge Schall's interpretation of the deal, as he just was spelling it out to you, and our canceling the deal altogether and saying there's no deal, you've got to go back and litigate the removal, as between those two, which do you want? We don't need to go back and do it, Your Honor. As between those two, which will you opt for, going back and redoing and starting all over again with the removal action or accepting an interpretation of the contract along the lines Judge Schall suggested? That's a hypothetical question. I'd like a hypothetical answer. I dig Judge Schall's interpretation, but I don't think you need to go that way, Your Honor. I would say the best route is to go back and dig the administrative judge's interpretation, and you'll look in there. She highlighted it. The fact of the matter is that she said all references. In her opinion, it's bold things. She makes reference to all references to the removal. That doesn't mean any of it. Maybe somehow it means forget it, folks. Thank you. I think we have the case, and it's been well presented, and I think we understand it. Thank you. Thank you. All rise. We'll call Judges 1-1 at 10 a.m.